## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TYREE DANIELS, individually and on behalf of all others similarly situated<br>13934 S Dearborn Street<br>Riverdale, IL 60827,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>GEORGETOWN UNIVERSITY<br>3700 O Street NW<br>Washington, D.C. 20057,<br><br>　　　　　Defendant. | Case No. 24-3122<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Tyree Daniels ("Daniels" or "Plaintiff") brings this Class Action Complaint ("Complaint") against Georgetown University ("Georgetown" or "Defendant"), as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsels' investigation, and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.　　This class action arises out of the recent data breach ("Data Breach") resulting from Georgetown's failure to implement reasonable and industry standard data security practices.

2.　　Established in 1789, Georgetown University is one of the world's leading academic and research institutions, offering a unique educational experience that prepares the next generation of global citizens to lead and make a difference in the world.[1]

---

[1] https://www.georgetown.edu/about/ (last visited Oct. 21, 2024)

3.     Georgetown has grown to be a major international research university with nine schools, an affiliated hospital and many highly ranked academic programs. Today, the university has more than 22,000 undergraduate and graduate students who take classes at five locations: Main Campus, Medical Center, Law Center, School of Continuing Studies, and the university's Georgetown Qatar campus.[2]

4.     Plaintiff's and Class Members' sensitive personal information—which they entrusted to Georgetown with the understanding that Georgetown would act reasonably to protect it against unauthorized disclosure—was compromised and unlawfully accessed due to the Data Breach.

5.     On October 17, 2024, Georgetown's Chief Information Officer ("CIO"), Doug Little, notified members of the Georgetown University Community of the Data Breach, indicating that student data from current and former students was compromised and that unauthorized access was gained by a subset of existing users.[3]

6.     The period of unauthorized access occurred between the hours of 8:00 a.m. on Wednesday, October 16, to 8:30 a.m. on Thursday, October 17, and the data included sensitive personally identifiable and academic information.[4]

7.     Defendant collected and maintained certain Personally Identifiable Information ("PII") of Plaintiff and the putative Class Members (defined below), who are (or were) students at Georgetown.

8.     The Privacy Policy available on Defendant's website states:

---

[2] https://www.georgetown.edu/who-we-are/our-history/#georgetown-today (last visited Oct. 21, 2024)
[3] https://www.georgetown.edu/news/gu-experience-student-data-exposure/ (last visited: Oct 21, 2024)
[4] *Id.*

In keeping with state and federal legislation, the University safeguards the privacy of patients, students, employees, University business, and other matters by protecting electronic records classified as confidential information.[5]

9.      Additionally, it describes that only persons with legitimate needs should have access to the PII it collects.[6] It claims to ensure this information should be "secure and not vulnerable to unauthorized modification, and the handling of the data must be subject to accountability".[7]

10.     Lastly, the Defendant's Privacy Policy acknowledges that:

The University has the responsibility to educate its constituents concerning privacy rights and the proper handling of information. (e.g., all constituents should know whom to consult about these matters and all employees should understand their responsibilities for abiding by policies for information handling.)[8]

11.     As a result of the Data Breach, Plaintiff and possibly hundreds of thousands of current and former students suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

12.     The Data Breach was a direct result of Defendant's failure to implement adequate

---

[5] https://www.georgetown.edu/privacy-policy/ (last visited: Oct 21, 2024)
[6] *Id.*
[7] *Id.*
[8] *Id.*

and reasonable cyber-security procedures and protocols necessary to protect its students' Private Information.

13.     Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to Data Breaches. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

14.     Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

15.     Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the Private Information that Defendant collected and maintained is now in the hands of data thieves.

16.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

17.     Plaintiff and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures

to deter and detect identity theft.

18.     Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

19.     Plaintiff's claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of himself and all other similarly situated persons. Plaintiff seeks relief in this action individually and on behalf of a similarly situated class of individuals for negligence, breach of implied contract, and unjust enrichment. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

20.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

21.     Plaintiff seeks remedies including, but not limited to, compensatory damages and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit/anti-fraud monitoring services funded by Defendant.

## **PARTIES**

22.     Plaintiff is a citizen and resident of Riverdale, Illinois where he intends to remain.

23.     Plaintiff is a graduate of Georgetown and provided PII to Defendant in the course of his education at Georgetown. Upon information and belief, Plaintiff's PII was compromised in the Data Breach.

24.     If Plaintiff had known that Defendant would not adequately protect his Private Information, he would not have entrusted Defendant with his Private Information or allowed Defendant to maintain this sensitive Private Information.

25.     Defendant, Georgetown University ("Georgetown" or "Defendant") is a private university located at 3700 O St NW, Washington, DC 20057, with its principal place of business located in Washington, DC.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

27.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District, it regularly conducts business in Washington, DC, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

28.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL ALLEGATIONS

### *Background*

29.     As noted above, Georgetown University is one of the world's leading academic and research institutions.[9]

30.     Plaintiff and Class Members are current and/or former students of Defendant.

31.     Upon information and belief, in the course of collecting Private Information from

---

[9] https://www.georgetown.edu/about/ (last visited Oct. 21, 2024)

students and alumni, including Plaintiff, Defendant promised to provide confidentiality and adequate security for current and formers student's data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

32.     Indeed, the Privacy Policy posted on Defendant's website provides that: "the University safeguards the privacy of patients, students, employees, University business, and other matters by protecting electronic records classified as confidential information."[10]

33.     Defendant specifically classifies the following as "sensitive information" that "requires high level of protection against unauthorized disclosure, modification, destruction, and use"

> Current and former students (protected under the Family Educational Rights and Privacy Act (FERPA) of 1974), including student academic, disciplinary, and financial records and student works such as homework, term papers, and exams; and prospective students, including information submitted by student applicants to the University.[11]

34.     In the course of their education, students, including Plaintiff and Class Members, provided Defendant with at least their PII.

35.     Plaintiff and Class Members, as former and current students of Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Students, in general, demand security to safeguard their Private Information.

***The Data Breach***

36.     On October 17, 2024, Defendant's CIO emailed students and alumni of the Data Breach claiming it occurred following a "maintenance and outage period of the Banner student

---

[10] https://www.georgetown.edu/privacy-policy/ (last visited Oct. 21, 2024)
[11] *Id.*

information system, [and that] a subset of student users in the GU Experience platform were able to access certain student data from current and former students".[12]

37.    Defendant learned of unauthorized activity within its computer networks and systems, which the Defendant determined to be the result of "[not] an external attack or security compromise of [their] system, but instead an inadvertent setting change that allowed a subset of existing users with GU IDs to gain access to data that would otherwise only be used by administrative staff."[13]

38.    Defendant's investigation determined that 29 current or recent Georgetown students may have accessed unauthorized data.[14]

39.    To date, Defendant has not released any further information pertaining to the extent of the breach, nor any specific details Defendant is taking to ensure future breaches from occurring.

40.    Following the CIO's email to students and alumni, Georgetown's newspaper, *The Hoya*, reported further details that included the types of personal information that was exposed including social security numbers, GPAs and financial aid information to name a few. [15]

41.    Upon information and belief, Plaintiff's and Class Members' Private Information was compromised and acquired in the Data Breach.

42.    The files containing Plaintiff's and Class Members' Private Information, that were accessed without authorization, included their PII.

---

[12] https://www.georgetown.edu/news/gu-experience-student-data-exposure/ (last visited Oct 21, 2024)
[13] *Id.*
[14] *Id.*
[15] https://thehoya.com/news/developing-data-leak-exposes-financial-aid-ssn-gpa-admissions-visa-information-of-students-and-graduates/ (last visited Oct. 21, 2024)

43.     Due to the Data Breach, unauthorized individuals were able to gain access to and obtain data from Defendant that included the Private Information of Plaintiff and Class Members.

44.     As evidenced by the Data Breach's occurrence, the Private Information contained in Defendant's network was not encrypted. Had the information been properly encrypted, only unintelligible data would have been exfiltrated.

45.     Plaintiff further believes that his PII and that of Class Members was or soon will be published to the dark web, where it will be available to purchase, because that is the *modus operandi* of cybercriminals.

46.     Defendant had obligations created by the FTC Act, contract, state and federal law, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

### *Data Breaches Are Preventable*

47.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

48.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting its equipment and computer files containing Private Information.

49.     To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

● Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[16]

50.    To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-    Apply latest security updates
-    Use threat and vulnerability management
-    Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-    Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-    Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-    Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-    Monitor for adversarial activities
-    Hunt for brute force attempts
-    Monitor for cleanup of Event Logs
-    Analyze logon events;

**Harden infrastructure**

-    Use Windows Defender Firewall
-    Enable tamper protection
-    Enable cloud-delivered protection

---

[16] *Ransomware FAQs, available at* https://www.cisa.gov/stopransomware/ransomware-faqs (last visited: Oct. 15, 2024)

-       Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[17]

51.     Given that Defendant was storing the Private Information of its current and former students, Defendant could and should have implemented all of the above measures to prevent and detect the Data Breach.

52.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and, upon information and belief, the exposure of the Private Information of possibly, hundreds of thousands of students, including that of Plaintiff and Class Members.

***Defendant Acquires, Collects, And Stores Students' Private Information***

53.     Defendant acquires, collects, and stores a massive amount of Private Information on its students, former students and other personnel.

54.     By obtaining, collecting, and using Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

55.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a promise to safeguard that information.

56.     Plaintiff and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes

---

[17] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Nov. 11, 2021).

only, and to make only authorized disclosures of this information.

### Value Of Private Information

57.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

58.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[20]

59.    For example, PII can be sold at a price ranging from $40 to $200.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

60.    PII can sell for as much as $363 per record according to the Infosec Institute.[23] PII is particularly valuable because criminals can use it to target victims with frauds and scams.

---

[18] 17 C.F.R. § 248.201 (2013).

[19] *Id.*

[20] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

[21] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[22] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).

[23] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited May 7, 2023).

61.    Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

62.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. Upon information and belief, the information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

63.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[24]

64.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

65.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

---

[24] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*:
https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).
[25] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:*
https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

*Defendant Fails To Comply With FTC Guidelines*

66.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

67.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[26]

68.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[27]

69.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[26] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 17, 2022).
[27] *Id.*

70.     Defendant failed to properly implement basic data security practices.

71.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to students' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

72.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its students. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### Defendant Fails To Comply With Industry Standards

73.     As noted above, experts studying cyber-security routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

74.     Several best practices have been identified that, at a minimum, should be implemented by entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices.

75.     Other best cybersecurity practices that are standard in the utilities industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

76.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

77.     These foregoing frameworks are existing and applicable industry standards in the utilities industry, and upon information and belief, Defendant failed to comply with at least one––or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## COMMON INJURIES & DAMAGES

78.     As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; (e) invasion of privacy; and (f) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

### *The Data Breach Increases Victims' Risk Of Identity Theft*

79.     Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

80.     The unencrypted Private Information of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

81.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

82.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other crimes against the individual to obtain more data to perfect a crime.

83.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches

can be the starting point for these additional targeted attacks on the victim.

84.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[28]

85.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

86.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

87.    The existence and prevalence of "Fullz" packages means that the Private

---

[28] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last visited on May 26, 2023).

Information stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiff and the other Class Members.

88.    Thus, even if certain information (such as Social Security numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

89.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### Loss Of Time To Mitigate Risk Of Identity Theft And Fraud

90.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

91.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

92.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as monitoring their accounts for fraudulent activity and checking their credit reports for unusual activity.

93.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the

damage to their good name and credit record."[29]

94.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[30]

95.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[31]

### Diminution Value Of Private Information

96.    PII is a valuable property right.[32] The value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

---

[29] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[30] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).
[31] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").
[32] *See, e.g.,* Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

97.     An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[33]

98.     In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[34,35]

99.     Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[36]

100.    Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[37]

101.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

102.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. Upon

---

[33] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[34] https://datacoup.com/
[35] https://digi.me/what-is-digime/
[36] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html
[37] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

information and belief, the information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

103.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

104.    The fraudulent activity resulting from the Data Breach may not come to light for years.

105.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

106.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to hundreds of thousands of individuals detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

107.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

108.    Given the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans

or lines of credit; or file false unemployment claims.

109.    Such fraud may go undetected until debt collection calls commence months, or even years later. An individual may not know that his or her personal information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

110.    Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

111.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

***Loss Of The Benefit Of The Bargain***

112.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for the provision of educational services, Plaintiff and other reasonable students understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received educational services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

## PLAINTIFF DANIELS' EXPERIENCE

113.    Plaintiff is a citizen and resident of the state of Illinois.

114.    Plaintiff was enrolled as a student with Defendant between 2017 and 2019.

115.    Plaintiff is a graduate of Defendant and part of its alumni network. Plaintiff provided Defendant his PII in course of receiving his education at Defendant.

116.    Upon information and belief, Plaintiff's PII has been compromised as a result of the Data Breach.

117.    Plaintiff has been injured by the compromise of his PII in the form of damages to and diminution in the value of his PII – a form of intangible property that was entrusted to Defendant, which was compromised in and as a result of the Data Breach. Plaintiff suffered lost time, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

118.    Plaintiff takes reasonable measures to protect his PII. He has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

119.    Plaintiff stores any documents containing his PII in a safe and secure location and diligently chooses unique usernames and passwords for his online accounts.

120.    Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

121.    Further, Plaintiff is and will remain at risk of harm in the future because Defendant continues to maintain his confidential PII but does not take adequate steps to protect that information from a data breach.

## CLASS ACTION ALLEGATIONS

122.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

123.    Specifically, Plaintiff proposes the following class definitions, subject to amendment as appropriate:

**Nationwide Class**
All persons in the United States whose PII was compromised as a result of the Data Breach (the "Class").

**Illinois Subclass**
All persons in the state of Illinois whose PII was compromised as a result of the Data Breach (the "Illinois Subclass").

124. Excluded from the Classes are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

125. Plaintiff reserves the right to modify or amend the definition of the proposed Classes, as well as add subclasses, before the Court determines whether certification is appropriate.

126. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

127. <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Although the precise number of such persons is currently unknown to Plaintiff and exclusively in the possession of Defendant, it is estimated that Defendant has over 200,000 alumni[38] and more than 22,000 current students.[39] Thus, the Class is sufficiently numerous to make joinder impracticable and warrant certification.

128. <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

---

[38] https://alumni.georgetown.edu/ (last visited Oct. 21, 2024)
[39] https://www.georgetown.edu/who-we-are/our-history/#georgetown-today (last visited Oct. 21, 2024).

a.  Whether Defendant engaged in the conduct alleged herein;

b.  Whether Defendant's conduct violated the FTCA;

c.  When Defendant learned of the Data Breach;

d.  Whether Defendant's response to the Data Breach was adequate;

e.  Whether Defendant unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

f.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

i.  Whether Defendant owed a duty to Class Members to safeguard their Private Information;

j.  Whether Defendant breached its duty to Class Members to safeguard their Private Information;

k.  Whether hackers obtained Class Members' Private Information via the Data Breach;

l.  Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.  Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

o.  What damages Plaintiff and Class Members suffered as a result of Defendant's misconduct;

p.  Whether Defendant's conduct was negligent;

q.  Whether Defendant was unjustly enriched;

r.  Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

s.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

129.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

130.  <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

131.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

132.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

133.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

134.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## COUNT I
### Negligence
### (On Behalf of Plaintiff and the Class)

135.    Plaintiff repeats and re-alleges each and every factual allegation contained in all previous paragraphs as if fully set forth herein.

136.    Defendant requires its students, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of providing its education related services.

137.    Defendant gathered and stored the Private Information of Plaintiff and Class Members as part of its business of running the university and providing education related services to students and alumni.

138.    Plaintiff and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

139.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

140.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

141.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or

affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

142.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

143.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its students. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of being students of Defendant.

144.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

145.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

146.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

147.    Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

148.    Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.  Failing to adequately monitor the security of their networks and systems;

c.  Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d.  Allowing unauthorized access to Class Members' Private Information;

e.  Failing to detect in a timely manner that Class Members' Private Information had been compromised;

f.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g.  Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

149.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

150.    Plaintiff and the Class are within the class of persons that the FTC Act is intended

to protect.

151.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act is intended to guard against.

152.    Defendant's violation of Section 5 of the FTC Act constitutes negligence.

153.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

154.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

155.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches across multiple industries.

156.    Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

157.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

158.    It was therefore foreseeable that the failure to adequately safeguard Class

Members' Private Information would result in one or more types of injuries to Class Members.

159.    Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

160.    Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

161.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

162.    Defendant has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

163.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

164.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

165.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft

of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

166.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

167.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

168.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

169.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

170.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to

future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Breach Of Implied Contract
### (On Behalf of Plaintiff and the Class)

171.    Plaintiff repeats and re-alleges each and every factual allegation contained in all previous paragraphs as if fully set forth herein.

172.    Plaintiff and Class Members were required to provide their Private Information to Defendant as a condition of receiving educational services from Defendant.

173.    Plaintiff and the Class entrusted their Private Information to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

174.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

175.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

176.    Defendant solicited, offered, and invited Plaintiff and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

177.    In accepting the Private Information of Plaintiff and Class Members, Defendant understood and agreed that it was required to reasonably safeguard the Private Information from unauthorized access or disclosure.

178.    On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

179.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

180.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

181.    Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

182.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

183.    Plaintiff and Class Members would not have entrusted their Private Information

to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

184.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

185.    Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

186.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

187.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

188.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### COUNT III
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

189.    Plaintiff repeats and re-alleges each and every factual allegation contained in all previous paragraphs as if fully set forth herein.

190.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of PII, and also paid monies to Defendant to avail themselves of Defendant's education

related services.

191.    Defendant accepted or knew that Plaintiff and Class Members conferred a monetary benefit to Defendant and accepted and retained those benefits by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's and Class Members' retained data and used Plaintiff's and Class Members' PII in the course of its operations.

192.    The monies paid to Defendant were supposed to be used by Defendant, in part, to pay for and oversee adequate data privacy infrastructure, practices, and procedures.

193.    In equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff's and Class Members because Defendant failed to oversee, implement, or adequately implement, the data privacy and security practices and procedures that Plaintiff and the Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

194.    As a result of Defendant's conduct, Plaintiff's and Class Members have been injured as alleged herein.

195.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein

196.    Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pled.

## COUNT IV
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act,
815 Ill. Comp. Stat. §§ 505/1, *et seq.*
(On Behalf of Plaintiff Daniels and the Illinois Class)**

197.    Plaintiff realleges and incorporates by reference all preceding allegations as

though fully set forth herein.

198.    Plaintiff brings this cause of action individually and on behalf of the members of the Illinois Subclass.

199.    The Illinois Consumer Fraud and Deceptive Business Practices Act was created to protect Illinois consumers from deceptive and unfair business practices.

200.    Georgetown's conduct described herein constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the educational services, in trade or commerce in Illinois, with the intention that Plaintiff and Illinois Subclass members would rely on such conduct in deciding to give their Private Information to Georgetown in exchange for receiving educational services, making it unlawful under 815 Ill. Comp. Stat. Ann. §505/1, *et seq.*

201.    Plaintiff and Illinois Subclass members relied on the material representations made by Georgetown about its data security practices and provided their Private Information with the understanding that Georgetown would safeguard this Private Information. Plaintiff and Class Members suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by 815 Ill. Comp. Stat. Ann. §505/1, *et seq.* Plaintiff and Illinois Subclass members acted as reasonable consumers would have acted under the circumstances, and Georgetown's unlawful conduct would cause reasonable persons to enter into the transactions (providing Private Information in exchange for educational services) that resulted in the damages.

202.    Accordingly, pursuant to 815 Ill. Comp. Stat. Ann. §505/1, *et seq.,* Plaintiff and Illinois Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. In

addition, given the nature of Georgetown's conduct, Plaintiff and Illinois Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Georgetown's unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class and Illinois Subclass;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.    For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to student data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

D.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.    Prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    Requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all

applicable regulations, industry standards, and federal, state, or local laws;

iii.    Requiring Defendant to delete, destroy, and purge the Private Information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    Requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v.    Prohibiting Defendant from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vi.    Requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    Requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    Requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.       Requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.       Requiring Defendant to conduct regular database scanning and securing checks;

xi.       Requiring Defendant to establish an information security training program that includes at least annual information security training for all employees with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.       Requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.       Requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.       Requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to

appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    Requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves; and

xvi.    Requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii.    For a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment.

E.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

F.    Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

G.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

H.    For an award of punitive damages, as allowable by law;

I.    For an award of attorneys' fees and costs, and any other expense, including expert

witness fees;

J.    Pre- and post-judgment interest on any amounts awarded; and

K.    Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 4, 2024

Respectfully submitted,

*/s/ Anthony M. Christina*
Christian Levis
D.D.C. Bar ID: NY0416
Peter Demato (*pro hac vice* forthcoming)
Radhika Gupta (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Anthony M. Christina
D.D.C. Bar ID: 230743
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Tel: (215) 399-4770
achristina@lowey.com

Benjamin F. Johns (*pro hac vice* forthcoming)
Samantha E. Holbrook (*pro hac vice* forthcoming)
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Tel: (610) 477-8380
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Attorneys for Plaintiff and Proposed Class*